IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF WILLIAM M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF WILLIAM M., JR., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

HARMONY R., APPELLANT, AND WILLIAM M., SR., APPELLEE.

Filed December 20, 2016.    No. A-16-320.

Appeal from the Separate Juvenile Court of Douglas County: WADIE THOMAS, Judge. Affirmed.

Kevin A. Ryan for appellant.

Donald W. Kleine, Douglas County Attorney, Amy Schuchman, and Chellsie Weber, Senior Certified Law Student, for appellee State of Nebraska.

David J. Tarrell for appellee William M., Sr.

INBODY and PIRTLE, Judges, and MCCORMACK, Retired Justice.

PIRTLE, Judge.

## I. INTRODUCTION

William M., Jr. (William Jr.), was removed from the care and custody of his biological parents Harmony R. and William M., Sr. (William Sr.). William Jr. was later adjudicated as being within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015). The Separate Juvenile Court of Douglas County found that there was clear and convincing evidence that William Jr. was also within the meaning of Neb. Rev. Stat. § 43-292(2) (Reissue 2016) and that termination of both Harmony's and William Sr.'s parental rights was in William Jr.'s best interests. We affirm the

termination of Harmony's parental rights. We also conclude that William Sr. did not properly cross-appeal; therefore, we grant him no affirmative relief and consider his arguments only to the extent that they address any error assigned by Harmony.

## II. PROCEDURAL BACKGROUND

Harmony and William Sr. are the biological parents of William Jr. who was born in December 2011. On January 12, 2012, a petition was filed in the Separate Juvenile for Douglas County alleging that William Jr. came within the meaning of Neb. Rev. Stat. § 43-247(3)(a), and lacked proper parental care due to the faults or habits of Harmony and William Sr. The petition alleged that Harmony's three older children Evy R., Christopher R., and Austin R., were removed from her care in February 2010 for allegations of domestic abuse. Reasonable efforts and services were provided, but Harmony was unable to reunify with the older children.

The petition alleged that on January 11, 2012, Harmony admitted to using methamphetamine on that day and she stated that she was high. William Sr. was arrested that day, and was incarcerated for possession of methamphetamine. It was alleged that Harmony and William Sr. engaged in domestic violence, and that their use of alcohol and/or controlled substances placed William Jr. at risk for harm. William Jr. was removed from the home and placed in a licensed foster home. He remained in the same home from January 12, 2012 to mid-July 2013 and the case was closed in September 2013.

On October 21, 2015, the State filed a petition alleging that William Jr. came within the meaning of Neb. Rev. Stat. § 43-247(3)(a). The petition alleged that: (A) William Jr. was found wandering the neighborhood unsupervised; (B) the home was observed to be kept in an unsafe and unsanitary condition; (C) Harmony and William Sr.'s use of alcohol and/or controlled substances places William Jr. at risk for harm; (D) both parents failed to provide safe, stable, and/or appropriate housing; (E) both parents failed to provide proper parental care, support, and/or supervision; and, (F) due to the listed allegations, William Jr. was at risk for harm.

On December 1, 2015, the State filed a supplemental petition and motion for termination of William Sr.'s parental rights. In addition to the original counts, the supplemental petition alleged that William Sr. had substantially and continuously or repeatedly neglected and refused to give William Jr. or a sibling necessary care and protection and that termination of William Sr.'s parental rights was in the child's best interests. The same day, the State filed an amended petition and motion for termination of Harmony's parental rights. In addition to the original counts, the amended petition alleged that Harmony had substantially and continuously or repeatedly neglected and refused to give William Jr. and his three older siblings necessary parental care and protection. The petition also alleged that termination of Harmony's parental rights was in William Jr.'s best interests.

An adjudication and disposition hearing on the State's supplemental petition relative to William Jr. and amended petition relative to Harmony took place on February 18 and 19, 2016. On March 4, the court issued orders terminating the parental rights of Harmony and William Sr. The court found William Jr. was a child as described in § 43-247(3)(a) and that there was clear and convincing evidence that William Jr. was also within the meaning of § 43-292(2). The court

found that termination of both William Sr. and Harmony's parental rights was in William Jr.'s best interests. On March 28, Harmony filed a notice of appeal.

### III. FACTUAL BACKGROUND

On October 15, 2015, an intake was received by the CPS hotline regarding William Jr. A neighbor reported seeing William Jr. out walking the streets of the neighborhood looking for his mother. The neighbor reported returning the child to the home and finding the front door open. The mother was not in the home and William Sr. was asleep on the toilet. The neighbor reported concerns about the potentially dangerous condition of the home and concerns of drug use in the home.

The N-FOCUS system, used by the department of health and human services lists any involvement a parent has with the State of Nebraska and DHHS. Akila Allen, a children and family services specialist was able to review this system and see that William Jr. had been a made a state ward shortly after his birth because his three older half-siblings, Austin, Evy, and Christopher, were already state wards in Nebraska. The older three children were removed due to allegations of domestic abuse, failure to protect, and failure to provide proper parental care, support, and/or supervision, and William Jr. was removed because there were concerns that Harmony was not able to care for him. She testified that the older children were not reunified with their mother. Harmony relinquished her parental rights to the older three children.

Harmony was offered UA testing, family support, supervised visitation, a domestic violence course and parenting education as well as two chemical dependency evaluations and one psychological evaluation. Harmony tested negative for drugs and worked with family support from January 2012 through the summer of 2013. William Jr. was returned to the family home in July 2013, and the case was closed in September 2013.

When Allen visited the home on October 20, 2015, she found Harmony standing in the backyard. Allen observed the lawn to be cluttered with scrap metal, trash, and other items that did not belong in the yard. She spoke to Harmony about the condition of the backyard and Harmony stated that she had received notice from the city to clean it up, and that was what she was doing. Allen did not observe Harmony actively cleaning.

Harmony allowed Allen and law enforcement officers, including Mark Cupak of the Omaha Police Department, to walk through the home. William Sr. returned to the home while they walked through the first floor, and he led the tour of the rest of the home. The kitchen was full of dirty dishes, there was trash on the floor, and the refrigerator was bare. Allen saw a can or vase with cat food in it and there was a strong odor of cat urine in the room William Sr. referred to as the "smoking room."

Cupak testified that he found the home to be in a "very filthy, cluttered condition." The officer observed piles of trash everywhere, piles of dishes, and a bathtub full of "brown stuff." He observed that food was ground into the floor and the house smelled of cat urine and rotting garbage. Police officers told Harmony and William Sr. that a child could not be left in the home in the current condition. The parents were asked to submit to urinalysis testing. Harmony initially agreed, but William Sr. refused, and he told Harmony that she should refuse as well.

William Jr. was removed from the parental home and was taken to Project Harmony for a foster care examination. Sarah Cleaver, a pediatric nurse practitioner performed a head-to-toe examination. Kelley Carter, a Triage Center Supervisor with Child Saving Institute located at Project Harmony also observed William Jr. on October 20, 2015. As part of her position, Carter looks for age-appropriate developmental levels of children. She was concerned with William Jr.'s level of play because he did not interact with or talk to the other children.

Cleaver and Carter testified that William Jr. was dirty, unkempt, and smelled strongly of cat urine. They reported that William Jr.'s body was caked with dirt, he was wearing dirty shorts with no underwear or diaper, and the shorts were on backwards.

Cleaver testified that William Jr. seemed to have very poor language and verbal skills for his age, he was missing several teeth and he appeared to be very large for his age. Cleaver said that based upon his weight, anemia, and the condition of his teeth, it was very likely that William Jr. was fed foods that were not nutritious. He did not know any colors and could not perform any counting. She recommended that William Jr. see a dentist and an eye doctor, and start taking a multivitamin with iron. She recommended an Early Development Network (EDN) assessment to evaluate his developmental skills to determine if any additional services were necessary. The Project Harmony intake indicated that William's Jr.'s hair follicle test was positive for methamphetamine.

William Jr. was placed with the same family who cared for him during the first removal. William Jr.'s foster mother testified that he returned from visits early on several occasions and sometimes visits did not take place. She said no visits were ever cancelled by her family. She further testified that when he returned from visits, William Jr. was often "difficult to handle," because he fell into his old habits and routines. She said he becomes bossy, giving directions instead of requests, and he tends to be more "hyper." She said he becomes noncompliant, or unwilling to follow directions. She enrolled William Jr. in Head Start and a member of the family works with him daily to learn letters, numbers, shapes, and colors.

In December 2015, Clarissa Conolley was assigned to be the family permanency specialist for William Jr. She testified that she was concerned because William Jr. did not know the alphabet, he did not recognize shapes and he struggled to correctly identify colors. She recommended Head Start and an EDN evaluation. William Jr. was on the waiting list for Head Start and was scheduled to begin on February 22, 2016.

For Harmony, Conolley recommended random UA testing, a chemical dependency (CD) evaluation, an initial diagnostic interview (IDI) and parenting classes. Harmony indicated that she would submit to UAs, but participated in only 5 UAs of 11 attempts. Harmony reported problems with her telephone, and Conolley suggested calling the agency to set up the testing. Harmony was referred to Heartland Family Services for parenting classes. Conolley testified that Harmony did not take the steps necessary to demonstrate financial need or complete the parenting classes, and she did not want to pay the $25 fee for the course.

Conolley testified that the visitation schedule was for three or four days per week for about two hours apiece. She testified that the parents had not consistently attended. She testified that there were 14 scheduled visits. Harmony missed five visits due to illness and William Sr. missed "about a dozen." Conolley recommended that all visits remain supervised because there were

instances when William Jr. had not been safe in the care of his parents. For example, during one visit at a local McDonald's, Harmony held the door open and allowed William Jr. to run past her into the parking lot and into the path of the drive-through traffic. She did not reach for him or say anything to stop him from running into traffic. Visits did not take place in the family home because it had not yet been deemed safe. Conolley testified that she had been in the home in January 2016 and had observed that significant progress had been made to remodel the home, but the work was not complete.

On March 4, the court issued orders terminating the parental rights of Harmony and William Sr. The trial court found William Jr. to be a juvenile within the meaning of § 43-247(3)(a) and § 43-292(2), and found that termination of their parental rights was in the child's best interests. This appeal followed.

## IV. ASSIGNMENTS OF ERROR

On appeal, Harmony asserts the juvenile court erred in finding that William Jr. was within the meaning of § 43-247(3)(a) and § 43-292(2). She also asserts the juvenile court erred in finding that termination of her parental rights was in the child's best interests.

As noted above, William Sr.'s purported cross-appeal does not comport with the Nebraska court rules of appellate practice. Because William Sr.'s assigned error regarding the court's determination of William Jr.'s best interests overlaps with that of Harmony, we will consider his argument as support for Harmony's assigned error, but disregard his remaining assignments of error.

## V. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Joseph S.*, 291 Neb. 953, 870 N.W.2d 141 (2015). When credible evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *Id.*

## VI. ANALYSIS

### 1. WILLIAM SR.'S PURPORTED CROSS-APPEAL

Before addressing the deficiencies of William Sr.'s purported cross-appeal, we first set forth the chronology of the appeal. Harmony filed a notice of appeal on March 28, 2016. William Sr. filed a notice of appeal on April 7, 2016. In response to William Sr.'s notice of appeal, the clerk of the Nebraska Supreme Court sent a letter to the Separate Juvenile Court for Douglas County and copied all attorneys of record, advising them that pursuant to Neb. Ct. R. App. P. § 2-101(C) (rev. 2010), multiple appeals from the same case could not be docketed. The clerk advised, "Therefore, the notice of appeal filed by [William Sr.] shall be treated as a second notice of appeal in the above-captioned matter." This is in accord with § 2-101(C), which states:

> Method of Docketing Case; Multiple Appeals from Same Case Prohibited. Upon receipt of the material required by § 2-101(B), the Clerk of the Supreme Court shall thereupon docket the case designating the party or parties first having filed the notice of appeal in the district

court as appellant or appellants. All other parties shall be designated as appellees, and any attempt to appeal thereafter made by any party to the action shall be filed in the existing case and no separately docketed.

Harmony filed a "Brief of Appellant" on June 13, 2016. William Sr. filed a "Brief of Appellee William . . ." on August 11, 2016. The State filed a "Brief of Appellee" on September 9, 2016. No further briefing occurred.

In William Sr.'s brief, he assigned errors and sought affirmative relief, but there is no designation of a cross-appeal on the cover of his brief, nor is a cross-appeal set forth in a separate division of the brief as required by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2012), which states in full:

> Where the brief of appellee presents a cross-appeal, it shall be noted on the cover of the brief and it shall be set forth in a separate division of the brief. The division shall be headed "Brief on Cross-Appeal" and shall be prepared in the same manner and under the same rules as the brief of appellant.

In *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999), the Nebraska Supreme Court declined to consider a father's arguments appealing the termination of his parental rights, because he failed to properly designate his arguments as a cross-appeal. As in the present case, the father filed a notice of appeal after the mother did so, making him an appellee. The father set forth assignments of error in his brief, which he simply titled "Brief of Appellee." *Id.* at 144, 602 N.W.2d at 450. In its refusal to consider the father's assignments of error, the court explained that "the appellate courts of this state have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee," *id.* at 146, 602 N.W.2d at 451, and "have repeatedly indicated that a cross-appeal must be properly designated pursuant to [§ 2-10]9(D)(4), if affirmative relief is to be obtained," 258 Neb. at 145, 602 N.W.2d at 450. The court further cautioned parties seeking affirmative review of their claims to be aware of the rules governing appeals, noting that "[a]ny party who fails to properly identify and present its claim does so at its peril." *Id.* at 147, 602 N.W.2d at 451. See, also, *In re Interest of Chloe P.*, 21 Neb. App. 456, 840 N.W.2d 549 (2013).

We note that in the present case, after William Sr. filed his notice of appeal, the appellate clerk notified him that his notice of appeal would be treated as a second notice of appeal and referred him to § 2-101(C). This rule advised William Sr. that he would be designated as an appellee, and he correctly designated himself as an appellee on his brief. However, William Sr. failed to comply with the proper filing of a cross-appeal. Section 2-101(E) instructs an appellee on how to assert a cross appeal, stating: "Cross-Appeal. The proper filing of an appeal shall vest in an appellee the right to cross-appeal against any other party to the appeal. The cross-appeal need only be asserted in the appellee's brief as provided by § 2-109(D)(4)."

Based upon our court rules, William Sr., as an appellee, was required to identify his brief as a cross-appeal on the cover and in a separate section in compliance with § 2-109(D)(4). As in *In re Interest of Natasha H. & Sierra H., supra*, and *In re Interest of Chloe P., supra*, we decline

to waive the rules on William Sr.'s behalf and to award him affirmative relief. We consider William Sr.'s arguments only to the extent that they address any error assigned by Harmony.

## 2. HARMONY'S APPEAL

### (a) Adjudication

Harmony asserts the juvenile court erred in finding that William Jr. was within the meaning of § 43-247(3)(a).

Section 43-247(3)(a) states the juvenile court in each county shall have jurisdiction of any juvenile who lacks proper parental care by reason of the faults or habits of his or her parent, guardian, or custodian or whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile.

The State's petition alleged that William Jr. was a child within the meaning of § 43-247(3)(a) due to the faults or habits of Harmony. The evidence shows that William Jr. was found to be living in an unsafe and unsanitary home and he was removed due to concerns that the parents did not provide a safe, stable, or appropriate home. When Allen and Cupak arrived at the home to check William Jr.'s well-being, he was dirty and was not clothed appropriately. There were concerns regarding William Jr.'s language skills and cognitive development, and the level of supervision that he received in the home. Upon our de novo review, we find the evidence presented supports the juvenile court's finding that William Jr. was within the meaning of § 43-247(3)(a) by a preponderance of the evidence.

### (b) Termination of Parental Rights

In order to terminate parental rights, a court must find clear and convincing evidence that one or more of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). In this case, the juvenile court found that the State established by clear and convincing evidence that grounds for termination existed under § 43-292(2), and that termination of Harmony's parental rights was in William Jr.'s best interests.

#### *(i) Statutory Grounds for Termination*

Harmony asserts the juvenile court erred in finding that William Jr. was within the meaning of § 43-292(2).

Section 43-292 states:

> The court may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
>
> . . . .

(2) The parents have substantially and continuously or repeatedly neglected or refused to give the juvenile or a sibling of the juvenile necessary parental care and protection.

The State alleged and presented evidence that Harmony had substantially and continuously or repeatedly neglected or refused to give William Jr. necessary parental care and protection. William Jr. was born in December 2011 and was a ward of the State from January 2012 to September 2013. He was removed from the parental home again in October 2015, approximately 2 months before his fourth birthday.

The evidence shows that in October 2015, the family was referred to DHHS because William Jr. was wandering the neighborhood by himself, looking for his mother. The neighbor who found William Jr. reported concerns regarding the parents' level of supervision, the condition of the home, and possible drug use in the home.

Allen and Cupak testified regarding the unsafe and unsanitary condition of the home when they arrived to check William Jr.'s well-being on October 20. There were piles of dirty dishes; there was trash on the floor; and the toilets, tubs, and sinks were dirty or unusable. There was no food in the kitchen and the basement smelled strongly of cat urine. Allen, Cleaver, Carter, and Conolley testified regarding William Jr.'s appearance, health, and level of cognitive development on that day. They expressed concern for his physical hygiene, as he was caked with dirt, he had a strong foul odor about him, and he was dressed inappropriately. Cleaver discussed the possibility of neglectful medical care because William Jr. was anemic, large for his age, he had numerous fillings in his teeth, and he was missing four upper central teeth. Cleaver and Conolley expressed concern that William Jr. was not being fed nutritious foods.

The State also alleged, and presented evidence that Harmony substantially and continuously or repeatedly neglected and refused to give necessary parental care and protection to William Jr.'s three older siblings. The record shows Austin, Evy, and Christopher were placed in the temporary custody of DHHS in 2010 due to allegations of domestic abuse, Harmony's failure to protect the children, and her failure to provide proper parental care, support, and supervision. The evidence shows that the three older children were not reunified with Harmony, who eventually relinquished her parental rights.

Harmony argues that she was not given enough time to rectify the faults and habits which led to William Jr.'s removal, and to improve her level of parental care. The petition in January 2012 and the amended petition in December 2015 contain several of the same allegations: that (a) Harmony failed to provide safe, stable, and/or appropriate housing; (b) Harmony failed to provide proper parental care, support, and/or supervision for William Jr.; (c) Harmony's use of alcohol and/or controlled substances placed William Jr. at risk for harm. There may have been a short time between the removal in 2015 and the amended petition for termination of Harmony's parental rights, but the evidence shows that over the course of several years, little progress has been made. Harmony has not maintained a safe and stable home, she has not fully complied with urinalysis testing, she has not fully participated in supervised visits, or demonstrated her ability to adequately parent William Jr. There is a pattern of continued neglect or failure to provide the

necessary standard of care for her children. Therefore we find clear and convincing evidence that statutory grounds for termination existed under § 43-292(2).

Harmony argues that reasonable efforts to preserve and reunify the family must be shown by the State when considering the termination of parental rights under § 43-292(6). However, subsection 43-292(6) was not alleged in the amended petition, and was not a ground for termination considered by the court or referenced in its order. If an appellate court determines that the lower court found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

### (ii) Best Interests of Minor Child

Harmony asserts the juvenile court erred in finding that termination of her parental rights was in William Jr.'s best interests.

The overriding legal framework is well settled. A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Alec S., supra.* The presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or probably will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries but each examines essentially the same underlying facts as the other. *Id.*

The evidence demonstrates that Harmony is unfit and that termination of her parental rights is in William Jr.'s best interests. As previously discussed, Harmony has demonstrated a pattern of child neglect, which led to the relinquishment of her parental rights to William Jr.'s three older siblings, and which led to William Jr.'s removal from her home. The Nebraska Supreme Court has stated the belief that "neglect of a prior sibling is relevant to the current inquiry and that past neglect, along with the facts relating to current family circumstances which go to best interests, are all properly considered in a parental termination case under § 43-292(2). *In re Interest of Sir Messiah T.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

The Nebraska Supreme Court has also held that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228(2015). The record indicates that even though Harmony successfully reunified with William Jr. in 2013, many of the same issues have plagued Harmony since the first juvenile court case was opened in 2010. Several witnesses testified that upon removal it was evident that William Jr. was not well cared for physically and he displayed developmental delays. The record shows Harmony failed to fully comply with urinalysis testing, failed to fully participate in supervised visitation, and failed to complete a parenting course. Connolly testified that Harmony has not demonstrated improved parenting skills or appropriate protective instincts, which prevents her from functioning as a fit parent. Further, although there has been improvement

in the home, the work required to make it a safe place for a child of William Jr.'s age has not been completed.

Conolley testified that it was her opinion, and the opinion of Nebraska Families Collaborative that Harmony's parental rights should be terminated, and that termination was in the child's best interests. Because this was Harmony's third juvenile court case, Conolley expressed concern for Harmony's ability to care for William Jr. properly and safely. Conolley opined that William Jr. needed a parent who could provide stability, provide for his developmental needs, work with him on learning objectives, and prepare him for attending school.

Allen testified that it was her belief that Harmony's parental rights should be terminated. She based this on the allegations of drug use, the condition of the home, Harmony's pattern of child neglect, and the fact that William Jr. had been removed from the parental home twice before the age of four.

For the foregoing reasons, we find the juvenile court did not err in determining there is clear and convincing evidence that termination of Harmony's parental rights was in William Jr.'s best interests.

## VII. CONCLUSION

Upon our de novo review, we conclude that the State proved by a preponderance of the evidence that William Jr. was a child within the meaning of § 43-247(3)(a). We also conclude the State proved by clear and convincing evidence that grounds for termination existed under § 43-292(2), and that termination was in William Jr.'s best interests. Because William Sr. did not properly designate his brief as a cross-appeal, we do not address his assigned errors. Accordingly, we affirm the orders of the juvenile court terminating Harmony and William Sr.'s parental rights to William Jr.

AFFIRMED.